IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Vermell D. Pyatt, | ) | C/A No. 3:10-2002-MBS-PJG |
| Plaintiff, | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| Harvest Hope Food Bank, | ) | |
| Defendant. | ) | |

The plaintiff, Vermell D. Pyatt ("Pyatt"), filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. against the defendant, Harvest Hope Food Bank ("Harvest Hope"). Pyatt asserts claims for race discrimination and retaliation.[1] This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the defendant's motion to dismiss or for summary judgment. (ECF No. 25.) Pyatt filed a response in opposition (ECF No. 52) and the defendant filed a reply (ECF No. 53). Having reviewed the parties' submissions and the applicable law, the court finds that the defendant's motion should be granted.

**BACKGROUND**

The following facts are either undisputed or are viewed in the light most favorable to Pyatt, to the extent they find support in the record. Pyatt, who is African American, began working for Harvest Hope in December of 2005 as a Data Analyst for Hunger and Poverty. This position was

---

[1] To the extent that Pyatt raised claims based on a failure to promote or a hostile work environment, she appears to have abandoned those claims. (See Def.'s Reply Mem. Supp. Summ. J. at 1 n.1, ECF No. 53 at 1 n.1.)



paid on an hourly basis. At Pyatt's ninety-day review, Denise Holland, the Executive Director of Harvest Hope, gave Pyatt a positive review, describing her as "a wonderful asset to the food bank" and "a team player helpful to others." (Pyatt Dep. Ex. 6, ECF No. 52-3 at 3.) Harvest Hope then made Pyatt a salaried employee and increased her remuneration. At her annual reviews in April of 2007 and 2008 Holland again gave her positive reviews and Pyatt again received pay raises.

In December 2008, Harvest Hope underwent an audit to ensure it was in compliance with the Fair Labor Standards Act. Several employees, including Pyatt, were subsequently reclassified from salaried to hourly employees. Pyatt's pay was not decreased; it was simply calculated on an hourly basis. After that, Pyatt was required to clock in and out and account for all of her time.

In August of 2009, Harvest Hope restructured its organization. As part of that restructuring, Pyatt's position was moved from the Agency Relations Department to the Development Department effective August 17. The Development Department was located in Harvest Hope's Columbia Mall office rather than its Shop Road location. On August 17, however, Pyatt was absent from work. Following a week's absence, she appeared at the Shop Road office to request permission to work from home for two weeks due to health issues. Harvest Hope initially authorized Pyatt to work from home until September 7, 2009. This was renewed at Pyatt's request until October 1. On October 2, after Pyatt had been working from her home for approximately seven weeks, Harvest Hope informed Pyatt that she could no longer work from home, but offered her the opportunity to take unpaid medical leave. Pyatt worked the week of October 5-9, then resigned from Harvest Hope, explaining that her physician had advised her that work-related stress was adversely affecting her health.

Pyatt describes several incidents that offended her during her tenure at Harvest Hope. First, shortly after she began working at Harvest Hope a co-worker identified only as "Gloria" questioned Pyatt about her educational background. When Pyatt replied that she had two masters degrees from the University of South Carolina, Gloria allegedly commented that it was unusual for a black person to have that much education.[2] Additionally, Gloria allegedly inquired whether Pyatt's grandmother had ever told her not to trust white people. Pyatt informed Gloria that Pyatt's grandmother was in fact herself white. When Gloria continued to make racially negative comments about Pyatt's family, Pyatt reported them to Holland and requested that Gloria be instructed to stop. Pyatt also contends that on one occasion Holland asked Pyatt her opinion regarding bi-racial couples. Pyatt responded that she had no issues with bi-racial couples.

Additionally, Pyatt identifies several situations where she perceived that Harvest Hope disparately treated African American employees from Caucasian employees. For example, she contends that black employees were required to give tours of the food bank to visitors, whereas white employees did not have to give tours. She also asserts that black employees were "disciplined for horse-playing" when white employees were not. Finally, she contends that employees working in the warehouse, the majority of whom were apparently African American, were the last to be notified when lunch was ordered for the employees.

---

[2] As Harvest Hope points out, Pyatt's original version of this incident as described in her deposition conflicts with that in her affidavit and relates only that Gloria remarked that Pyatt must be really smart to have two advanced degrees from the University of South Carolina. (Compare Pyatt Dep. at 131:12-14, ECF No. 53-2 at 5 with Pyatt Aff. ¶ 6, ECF No. 52-1 at 2.)



DISCUSSION

A.   **Summary Judgment Standard**

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*." Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (emphasis in original) (internal quotation marks & citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. See id. at 148 (stating that "[c]ertainly there



will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

**B.    Burden-Shifting Framework in Employment Cases**

A plaintiff may demonstrate discrimination through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action.   Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010).   The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas frame-work—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks & citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was " 'not its true reason[], but [was] a pretext for discrimination.' " Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext " 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " Merritt,



601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005).  To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence.  Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves, 530 U.S. at 148.  However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate.  Id.  Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Id. at 148-49.  "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination."  Merritt, 601 F.3d at 294-95.

C.   **Disparate Treatment Claim**

To obtain relief based upon alleged race discrimination under Title VII, a plaintiff must demonstrate that:  (1) she is a member of the protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse action, she was performing at a level that met the employer's legitimate expectations; and (4) her position remained open or was filled by a similarly qualified



individual outside the protected class. Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005) (quoting Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004) (*en banc*)); see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Pyatt's discrimination claim fails as a matter of law because she cannot show that she suffered an adverse employment action under controlling precedent. With regard to a disparate treatment claim, an adverse employment action is "a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.' " Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (quoting James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004)). It must constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different job responsibilities, or a decision causing a significant change in benefits. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

Pyatt contends that she was constructively discharged, and the parties appear to agree that a constructive discharge can be an adverse employment action under Title VII. To establish that she was constructively discharged, however, Pyatt must show that Harvest Hope created intolerable working conditions in a deliberate effort to force her to resign. Whitten v. Fred's, Inc., 601 F.3d 231 (4th Cir. 2010); Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th Cir. 1995). A constructive discharge occurs only when a reasonable person in the employee's position would have felt compelled to resign. See Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004). "An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not,

however, guaranteed a working environment free of stress." Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 187 n.2 (4th Cir. 2004).

Pyatt cannot establish constructive discharge on this record. As an initial matter, the court observes that in support of her constructive discharge argument, Pyatt erroneously relies on the standard enunciated by the United States Supreme Court in Burlington Northern & Santa Fe Railway Company v. White, 548 U.S. 53, 67-69 (2006). (See Pl.'s Mem. Opp'n Summ. J. at 8, ECF No. 52 at 8.) The Court in White, however, was addressing the circumstances that can constitute an adverse action in the context of a *retaliation* claim, a test that is more lenient than the standard to establish an adverse employment action for a *disparate treatment* claim, or the standard to show a *constructive discharge*.[3] Compare White, 548 U.S. at 68 (stating that a plaintiff must show that a reasonable employee would have found the challenged action "materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination") with Ellerth, 524 U.S. at 761 (stating that an adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different job responsibilities, or a decision causing a significant change in benefits).

The circumstances described by Pyatt as compelling her to resign do not meet the requisite standard for constructive discharge. First, Pyatt contends that she was subjected to racially offensive remarks "throughout her employment." (Pl.'s Mem. Opp'n Summ. J. at 9, ECF No. 52 at 9.) The record does not support this characterization. Pyatt identifies three remarks—two involving Gloria

---

[3] The court observes that counsel for both sides, who are all good lawyers, appear to miss this important distinction and conflate these three, separate standards. Counsel for Harvest Hope, for example, conversely attempts to apply the stricter Ellerth standard for adverse employment action in a disparate treatment case to Pyatt's retaliation claim. See infra part D; (Def.'s Mem. Supp. Summ. J. at 16, ECF No. 25-1 at 16).

Page 8 of 19



and one involving Holland—that touch on race. However, to the degree Pyatt provides any evidence regarding the time frame of these alleged comments, the record indicates that they were made early in her tenure with Harvest Hope, years before she resigned in the fall of 2009. See Lindsey v. One Source, C/A No. C-05-571, 2006 WL 3360285, at *7 (S.D. Tex. Nov. 20, 2006) (finding that racially derogatory remarks that occurred over eight months before the plaintiff's resignation and were no longer happening when the plaintiff resigned could not form the basis of a constructive discharge); see also Douglas v. Mitzelfeld's, Inc., 8 F. Supp. 2d 650, 660 (E.D. Mich. 1997) (finding that isolated and undated incidents did not create an environment supporting a constructive discharge). Moreover, case law instructs that isolated remarks, unless extreme, generally do not make the workplace so intolerable as to rise to the level of constructive discharge. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (stating that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal citation and quotation marks omitted).

Next Pyatt contends that she and another African American employee were changed from salaried to hourly employees. Her argument ignores both the fact that a white employee was also reclassified (Second McLellan Aff. ¶¶ 2-4, ECF No. 53-1 at 1) and the fact that her remuneration was not decreased. See Holland, 487 F.3d at 219; see also Ellerth, 524 U.S. at 761. Further, her argument that black employees were disciplined for "horseplay" while white employees were not cannot support her claim of adverse employment action via constructive discharge, since the record is devoid of any evidence that Pyatt herself was ever disciplined for such behavior. See Honor, 383 F.3d at 187 n.2 (stating that constructive discharge theory protects an employee from a calculated effort to pressure him into resignation by imposing unreasonably harsh conditions, in excess of those

faced by his co-workers); see also Johnson v. Shalala, 991 F.2d 126, 131 (4th Cir. 1993) ("Deliberateness can be demonstrated by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment."). Finally, her contention that her transfer to the Columbia Mall office made it more difficult for her to perform her data analysis is both insufficient as a matter of law and illogical. First, case law is clear that increased stress or circumstances that make a job more difficult cannot alone support a constructive discharge or adverse employment action. See Honor, 383 F.3d at 187 n.2 (stating that an employee is not guaranteed a working environment free of stress); Spriggs v. Pub. Serv. Comm'n of Md., 197 F. Supp. 2d 388, 393 (D. Md. 2002) ("An action that merely causes an employee irritation or inconvenience, but does not affect a term, condition, or benefit of her employment, is not an adverse employment action."). Further, her contention in this regard flies in the face of her own testimony that she performed her job at home for seven weeks—away from the Shop Road headquarters[4]—in a satisfactory manner. (Pyatt Aff. ¶¶ 15-17, ECF No. 52-1 at 4.)

Finally, her argument that work stress negatively affected her health is also insufficient to show constructive discharge. First, she presents no medical evidence supporting this contention. Moreover, the case upon which she relies involved vastly different conduct from that alleged here. In Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995), the court found the conduct alleged in that case was sufficiently intolerable to support the plaintiff's constructive

---

[4] Although while working from home Pyatt met with her supervisor twice a week, these meetings were to review her work and discuss upcoming assignments. (Pyatt Aff. ¶¶ 15-17, ECF No. 52-1 at 4.) Nowhere in the record is there any indication that while working from home Pyatt found it necessary to go to the Shop Road headquarters to obtain the data she needed for her analysis, which is the basis for her objection to her transfer to the Columbia Mall location.



discharge argument because the plaintiff, who was of Iranian national origin, was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf' " on an almost daily basis. Id. at 1131, 1132.  Additionally, the plaintiff had apparently introduced medical evidence that the harassment had caused an ulcer. Id. at 1129.  Here, the record does not show conduct nearly so egregious as that at issue in Amirmokri, does not establish a nexus between the alleged racially offensive occurrences and Pyatt's health,[5] and contains no medical evidence—but rather only Pyatt's own opinion—that Pyatt's health had deteriorated to the degree that she had to quit work. Compare id. at 1129 ("His doctor told him that he was developing an ulcer caused by work-related stress and that *he should quit his job* if the harassment and stress did not end.") (emphasis added) with (Pyatt Aff. ¶¶ 41-42, ECF No. 52-1 at 7 and Richard Aff. ¶¶ 10-13, ECF No. 52-2 at 3).

Finally, Pyatt cannot establish a constructive discharge because the record contains insufficient evidence that Harvest Hope deliberately forced her to resign. See Whitten, 601 F.3d at 248.  As an initial matter, the court observes that it is undisputed that Harvest Hope initially approved her request to work from home for two weeks, extended that time repeatedly, and then ultimately offered Pyatt the opportunity to request an unpaid medical leave of absence.  Moreover, Pyatt's failure to seek redress from Harvest Hope prior to her resignation bars her claim based upon constructive discharge. See Scott v. Ameritex Yarn, 72 F. Supp. 2d 587, 595 (D.S.C. 1999) (Herlong, J.); see also Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless

---

[5] In fact, Pyatt's own evidence suggests that her stress stemmed from being directed by her supervisors to alter data used in reports, not from intolerable working conditions based on her race. (Pyatt Aff. ¶¶ 38-41, ECF No. 52-1 at 7); see Lightner v. City of Wilmington, N.C., 545 F.3d 260, 263-64 (4th Cir. 2008) (finding that a plaintiff's repeated admission during litigation that the real reason for his suspension was to cover up department wrongdoing wholly undermined plaintiff's claim of race or gender discrimination under Title VII).

conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.") (quoting Rabinovitz v. Pena, 89 F.3d 482, 489 (7th Cir. 1996)). Viewing the record as a whole, and even considering the actions alleged by Pyatt in combination, Pyatt has introduced insufficient evidence to show that Harvest Hope deliberately created an intolerable working environment in excess of that faced by her co-workers to force Pyatt to resign. See Honor, 383 F.3d at 187 n.2 (stating that constructive discharge theory protects an employee from a calculated effort to pressure him into resignation by imposing unreasonably harsh conditions, in excess of those faced by his co-workers).

Even if these actions could be considered to be adverse employment actions within the meaning of the applicable Title VII jurisprudence, Harvest Hope has offered legitimate, nondiscriminatory reasons for each of the actions identified by Pyatt and she cannot show on this record that the reclassification was a result of discrimination. In support of her argument of pretext, Pyatt contends that when she was reclassified from salaried to hourly, the reason provided for the reclassification was that she did not supervise any employees. When she pointed out that some white employees who were salaried similarly did not supervise anyone, those employees were given minor supervisory duties overseeing family members of employees and board members who were apparently volunteering at Harvest Hope. Even assuming this evidence is probative of the falsity of Harvest Hope's stated reason for the reclassification, abundant and unrefuted evidence in the record shows that the reclassification was not based on any discriminatory animus. (Second McLellan Aff. ¶¶ 2-4, ECF No. 53-1 at 1); see Reeves, 530 U.S. at 148 ("Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

Pyatt's other argument to demonstrate pretext is that although Pyatt was informed that reporting to work was an essential function of her job and that she could therefore no longer work from home, a white employee, Amy Lowery, was permitted to work from home.  This fact, however, is not probative to show that Harvest Hope's stated reason for disallowing Pyatt to continue to work from home was false, because Lowery is not a valid comparator for Pyatt.  To establish a case of disparate treatment based upon comparison of a plaintiff's treatment to that of non-minority employees, the plaintiff must show that the comparators are similarly situated in all relevant respects.  See McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001) (emphasizing that an employee must be similarly situated in all material respects); Haywood v. Locke, No. 09-1604, 2010 WL 2711294, at *3 (4th Cir. July 6, 2010) (stating that "plaintiffs are required to show that they are similar in all relevant respects to their comparator").  To be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare her treatment must have dealt with the same supervisor and been subject to the same standards, and there must be no distinguishing or mitigating circumstances.  See Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (discussing the meaning of "similarly situated" in the context of a disparate discipline case); Duggan v. Sisters of Charity Providence Hosp., 663 F. Supp. 2d 456 (D.S.C. 2009) (same); see also Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) (stating that "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct



without any mitigating or distinguishing circumstances"); Smith v. Stratus Computer, Inc., 40 F.3d 11 (1st Cir. 1994) (stating that in disparate treatment cases, employees must be similar in all relevant aspects, such as in performance, qualifications, and conduct).  Here, the unrefuted evidence shows that at the time Lowery was permitted to work from home she was a part-time employee whose duties largely included calling on donors to thank them.  (Second McLellan Aff. ¶¶ 5-8, ECF No. 53-1 at 1-2.); see also Ilhardt v. Sara Lee Corp., 118 F.3d 1151, 1155 (7th Cir. 1997) (finding that a full-time employee was not similarly situated to a part-time employee).  Because their duties differed so vastly and they were not subject to the same standards, Pyatt cannot show that she and Lowery are similarly situated in all relevant respects.  Thus, Pyatt's claim of disparate treatment based on race fails as a matter of law.

**D.     Retaliation Claim**

Pyatt's retaliation claim also fails.  Title VII makes it unlawful for an employer to retaliate against an employee for engaging in activity protected by the statute.  See 42 U.S.C. § 2000e-3(a).  In a typical retaliation case, a plaintiff must show that: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action."  Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Holland, 487 F.3d at 218.  Harvest Hope challenges Pyatt's ability to show either that she suffered adverse action or that any such action was causally connected to protected activity.

To establish that she suffered an adverse action with respect to a retaliation claim, a plaintiff must show that the adverse action was objectively material.  Burlington N. & Santa Fe Ry. Co. v.

White, 548 U.S. 53, 68 (2006).[6] The United States Supreme Court has held that Title VII's prohibition of adverse employment action taken in retaliation for protected activity "is not limited to discriminatory actions that affect the terms and conditions of employment." Id. at 64. Rather, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67. However, the anti-retaliation provision does not shield an employee from all retaliation, but rather only from retaliation that produces injury or harm. Id. Accordingly, to fall within the provision's protection, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). A plaintiff must show *material* adversity to separate the significant harms from the trivial, as "Title VII . . . does not set forth 'a general civility code for the American workplace.' " White, 548 U.S. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). The test is an objective one and considers the reactions of a *reasonable* employee. White, 548 U.S. at 68. Further, "[c]ontext matters," and the significance of the adverse employment action must be analyzed under the circumstances particular to the plaintiff. See id. at 69. Thus, "an 'act that would be immaterial in some situations is material in others.' " Id. (quoting Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 661 (7th Cir. 2005)). The standard analyzes the challenged retaliatory act, not the

---

[6] As noted above, the test for adverse action with regard to a retaliation claim is different from that for a claim based on discriminatory disparate treatment. Harvest Hope's reliance on Ellerth's requirement that the adverse action "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" is inapposite with regard to Pyatt's retaliation claim. (See Def.'s Mem. Supp. Summ. J. at 16, ECF No. 25-1 at 16.)

underlying conduct that gave rise to the Title VII complaint. White, 548 U.S. at 69. The question is whether the challenged action was material from the perspective of a reasonable person in the plaintiff's position. Id. at 69-70.

To prove a causal connection, a plaintiff asserting a retaliation claim must be able to show that her employer took the adverse action " '*because* the plaintiff engaged in a protected activity.' " Holland, 487 F.3d at 218 (emphasis in original) (quoting Dowe v. Total Action Against Poverty in Roanoake Valley, 145 F.3d 653, 657 (4th Cir. 1998)). Thus, to demonstrate causation, a plaintiff must show that the employer was aware of the protected activity. See Shield v. Fed. Express Corp., 120 F. App'x 956, 962 (4th Cir. 2005) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 715 (7th Cir. 2004)). In certain circumstances, temporal proximity between the protected activity and the adverse action can be probative of a causal connection. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (noting that to establish a causal connection based on temporal proximity alone, the time between the employer's knowledge of the protected activity and the adverse employment action must be "very close" and holding a twenty-month period to be insufficient). Further, "[i]n cases where 'temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.' " Lettieri v. Equant, Inc., 478 F.3d 640, 650 (4th Cir. 2007) (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)).

In her opposition to summary judgment, Pyatt identifies two retaliatory adverse actions. First, she contends that she was transferred to the Columbia Mall location in retaliation for voicing opposition to Harvest Hope's disparate treatment of African American employees and for her refusal

to alter poundage data for reporting purposes. (Pl.'s Mem. Opp'n Summ. J. at 14, ECF No. 52 at 14.)

As discussed above, Pyatt's assertion that working from the Columbia Mall office rather than the Shop Road location "made it more difficult for her to perform her duties" is objectively unreasonable given her testimony that she satisfactorily performed her job from home. Further, Pyatt's vagueness as to the time frame of her opposition activity, which she describes as continual, prevents a reasonable inference of causation based on temporal proximity. See Hill v. IGA Food Depot, C/A No. No. 2:04-00966-WKW-VPM (WO), 2006 WL 3147672, at *6 (M.D. Ala. Nov. 2, 2006) (holding that a plaintiff failed to establish casual connection in part because he "provided no dates by which the court might judge a temporal relationship between his alleged complaint and his termination"). In fact, she seems to attribute the cause of her location transfer and alleged constructive discharge to her refusal to alter poundage data beginning in the spring of 2009, not to any opposition to Title VII discrimination. See Lightner, 545 F.3d at 264 (stating that Title VII prohibits discrete forms of discrimination and is not a general whistleblower statute). Further, although Pyatt relies on an alleged pattern of retaliatory conduct, see Lettieri, 478 F.3d at 650, no reasonable jury could infer that any adverse action identified by Pyatt was causally connected to her opposition activity in light of the unrefuted evidence that Pyatt was repeatedly given positive performance reviews and pay increases even after voicing opposition to Harvest Hope's perceived disparate treatment of black employees. (See generally Def.'s Reply Mem. Supp. Summ. J. at 12-13, ECF No. 53 at 12-13.)

Second, Pyatt asserts that she suffered retaliation by being constructively discharged. For the reasons discussed above, Pyatt cannot show that any of the alleged adverse actions made her



working conditions so intolerable as to constitute a constructive discharge. Nor do any of them, viewed independently, meet the standard enunciated by the United States Supreme Court in White, since no reasonable employee would have been dissuaded from engaging in protected activity because of them. Similarly, even if Pyatt could establish a *prima facie* case of retaliation, as discussed above, Harvest Hope has offered legitimate, nondiscriminatory reasons for the allegedly adverse actions and Pyatt cannot show on the record presented that she was a victim of unlawful retaliation. See Merritt, 601 F.3d at 294-95 ("Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination."). Accordingly, Harvest Hope is entitled to summary judgment on Pyatt's retaliation claim.

## RECOMMENDATION

Pyatt's claims fail as a matter of law. The court therefore recommends that Harvest Hope's motion for summary judgment (ECF No. 25) be granted.

*[signature: Paige J. Gossett]*

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

February 1, 2012
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).